IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERNIE WINSLOW, et al.,<br><br>   Plaintiffs,<br><br> v.<br><br>THE CITY OF OAKLAND, et al.,<br><br>   Defendants. | Case No. 20-cv-01510-CRB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART REQUEST FOR TEMPORARY RESTRAINING ORDER** |

Ashley Hammond, Markaya Spikes, Vanessa Trinidad, Michelle Bustamante, and Ernie Winslow (collectively, "Plaintiffs") are currently experiencing homelessness and reside in an encampment located at East 8th Street and Alameda Avenue in Oakland, California (the "High Street encampment"). Defendants are the City of Oakland, the Oakland Department of Public Works, the Oakland Police Department, Oakland Major Libby Schaaf, Oakland's Assistant to City Administrator Joe DeVries, and ten Doe defendants (collectively, "Defendants"). Plaintiffs are seeking a Temporary Restraining Order enjoining Defendants from removing Plaintiffs and Plaintiffs' property from the High Street encampment, or taking any such action without following Defendants' own stated policies governing the removal of encampments. The Court holds that the City may remove Plaintiffs and their property from the High Street encampment only if it fully complies with its own stated policies.

**I. BACKGROUND**

Each plaintiff currently resides at the High Street encampment. See Hammond Decl. (Hammond dkt. 6) at 3; Trinidad Decl. (Hammond dkt. 6) at 11; Spikes Decl. (Hammond dkt. 6) at 17; Winslow Decl. (Bustamante dkt. 4) at 5; Bustamante Decl. (Bustamanate dkt. 8) at 9. Each of them has lived at the High Street encampment for months or years, and all Plaintiffs keep

property at the encampment. See generally id. The High Street encampment is located at East 8th Street and Alameda Avenue in Oakland, California. Bustamante Decl. at 9.

On February 21, 2020, Defendants posted a notice to vacate the property ("Vacate Notice"). Bustamante Decl. Ex. H. The Vacate Notice states that the site has been deemed uninhabitable and directs all persons to "vacate this site and remove any personal belongings." Id. It states that on the specified time and date, Public Works crews will "close this encampment" and remove and store any property left at the site. Id. It emphasizes that "property that is unsafe or hazardous to store will be immediately discarded." Id. It also lists a phone number to call with questions or concerns. Id. It indicates that the High Street encampment will be closed on March 3 and 4, 2020. Id.

Oakland has in place policies governing the closure of homeless encampments. Two of these policies are the Encampment Management Policy, id. Ex. G, and the Standard Operating Procedure, id. Ex. F. The former discusses at a high level of generality the City's goals and strategies for addressing homelessness, id. Ex. G; the latter establishes the concrete steps the City says that it takes in "[r]emov[ing] [h]omeless [e]ncampments in the public right-of-way and on City owned property." Id. Ex. F at 1. The policies provide that when the City decides to clear a homeless encampment, it first posts a Vacate Notice at least 72 hours in advance of that action. Id. at 3. The Standard Operating Procedure then sets out the following procedures:

> 5. PWA [Public Works Agency] shall return to the site on the specified date to remove any belongings left at the encampment site, and request the assistance of the Oakland Police Department (OPD) if necessary.
> 6. City personnel shall not prevent occupants from retrieving their belongings before vacating the encampment site.
> 7. City personnel shall not confiscate or remove belongings from site when the occupant is present, absent a reasonable belief that the belongings are an immediate threat to public health and safety or are evidence of a crime or contraband.
> 8. PWA staff shall take photographs of the encampment site prior to the cleanup.
> 9. PWA staff shall immediately dispose of belongings that are considered to be clearly trash or are unsafe for storage, such as food or food wrappers, soiled items, or used personal hygiene items . . . .
> 10. PWA staff will collect, bag, and label personal belongings left at the site. A "Notice of Collected Property" will be posted where the original "Notice to Vacate" was previously posted, and will contain the PWA Call Center telephone number . . . .

2

>  11. PWA shall itemize the belongings collected and include
> the location, date, and time of collection on the itemization form.
>  12. The collected belongings will be stored at a PWA facility
> for at least ninety (90) days.

Id. at 2.

Plaintiffs contend that the City does not comply with these policies. Many have had property destroyed or discarded during previous evictions. See, e.g. Winslow Decl. at 7 ("The City started throwing away my property all at once—my dirt bike, a trailer bed, my trailers for work, my scrap metal [and] recycle, electronics, medicine, my wallet, my ID, $500 cash . . . , bicycles, backpacks, suitcases."); Bustamante Decl. at 7 ("[T]hey threw out clothes, all my paperwork for court, ID, birth certificates, electronics, my phone, speakers, tools, EBT card, my wallet including $100, make up, my kids photos [and] other memorabilia. This happens every time we are evicted."); Hammond Decl. at 6 ("[T]he City has not offered to follow their bag, tag [and] store policy, but . . . Human Services told me that if I couldn't move my trailer [and] my property it would be removed by a tow company [and] department of Public Works [and] destroyed."). They thus contend that, based on the City's past practices, the City will fail to follow its policies and destroy their property durin the eviction at issue here. See, e.g. Bustamante Compl. (Bustamante dkt. 1) at 4.

Plaintiffs seek a Temporary Restraining Order enjoining their removal and the removal of their property from the High Street encampment and directing Defendants to follow the City's stated policies on the removal of homeless encampments.  Bustamante TRO (Bustamante dkt. 5); Winslow TRO (Bustamante dkt. 3); Hammond TRO (Hammond dkt. 2); Trinidad TRO (Hammond dkt. 3); Spikes TRO (Hammond dkt. 4).

## II. DISCUSSION

A TRO is an "extraordinary remedy" that should only be awarded upon a clear showing that the plaintiff is entitled to such relief. See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008).  The party seeking a TRO must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. See id. at 20. Alternatively, the moving party must demonstrate that "serious questions going to the merits were

3

raised and that the balance of hardships tips sharply in the plaintiff's favor," and that the other two Winter elements are met. Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1134–35 (9th Cir. 2011). The "[l]ikelihood of success on the merits 'is the most important' Winter factor." Disney Enters., Inc. v. VidAngel, Inc., 869 F.3d 848, 856 (9th Cir. 2017).

### A. Likelihood of Success on the Merits

Plaintiffs argue that Defendants' threatened actions would violate the Fourth and Fourteenth Amendments and the Eighth Amendment. Bustamante Compl. at 3. Two Ninth Circuit cases guide the Court's evaluation of these claims. In Lavan v. City of Los Angeles, 693 F.3d 1022 (9th.Cir. 2012), the Ninth Circuit held that the Fourteenth Amendment's Due Process Clause "protect[s] homeless persons from government seizure and summary destruction of their unabandoned, but momentarily unattended, personal property." Id. at 1024. Martin v. City of Boise, 902 F.3d 1031 (9th Cir. 2018), amended and superseded on denial of reh'g, 2019 WL 1434046 (Apr. 1, 2019), held that "the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter." Id. at 1048. This Order addresses Plaintiffs' Eighth and Fourteenth Amendment claims in turn.[1]

#### 1. Eighth Amendment

The Eighth Amendment's bar against cruel and unusual punishments "circumscribes the criminal process in three ways." Ingraham v. Wright, 430 U.S. 651, 667 (1977). "First, it limits the type of punishment the government may impose; second, it proscribes punishment "grossly disproportionate" to the severity of the crime; and third, it places substantive limits on what the government may criminalize." Martin, 902 F.3d at 1046. Applying this standard to a Boise city ordinance that made it a misdemeanor to use "any of the streets, sidewalks, parks, or public places as a camping place at any time," the Ninth Circuit reached the "narrow" holding that "so long as there is a greater number of homeless individuals in [a jurisdiction] than the number of available beds [in shelters]," the

---

[1] The Court does not believe Plaintiffs have stated a cognizable Fourth Amendment claim.

4

jurisdiction cannot prosecute homeless individuals for 'involuntarily sitting, lying, and sleeping in public.' That is, as long as there is no option of sleeping indoors, the government cannot criminalize indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter." Martin, 902 F.3d at 1048 (quoting Jones v. City of Los Angeles, 444 F.3d 1118, 1138 (9th Cir. 2006), vacated, 505 F.3d 1006 (9th Cir. 2007) (alterations in original)). However, the Ninth Circuit also cautioned that Martin "in no way dictate[d] to the City that it must provide sufficient shelter for the homeless, or allow anyone who wishes to sit, lie, or sleep on the streets . . . at any time and at any place." Id. (quoting Jones, 444 F.3d at 1138 (second alteration in original)).

Martin does not establish that Plaintiffs are likely to succeed on the merits of their Eighth Amendment claim. That is so because the threatened actions do not require the arrest of Plaintiffs—or indeed of any homeless person residing at the High Street encampment. As Judge Gilliam explained in a case in which plaintiffs experiencing homelessness in Oakland sought to enjoin a clean and clear of a different homeless encampment:

> Plaintiffs are not faced with punishment for acts inherent to their unhoused status that they cannot control . . . . Plaintiffs' theory would therefore require the Court to extend the right described in Martin well beyond the parameters set by the Ninth Circuit. Martin does not establish a constitutional right to occupy public property indefinitely at Plaintiffs' option.

Miralle v. City of Oakland, 2018 WL 6199929, at *2 (N.D. Cal. Nov. 28, 2018); see also Sullivan v. City of Berkeley, 2017 WL 4922614, at *4 (N.D. Cal. Oct. 31, 2017) (holding that plaintiffs were unlikely to succeed on the merits of their claim that being moved from BART property would violate the Eighth Amendment because BART was entitled to enforce trespass laws on its property).

The Court is fully persuaded by the reasoning of Miralle and Sullivan: while Martin limits localities' ability to arrest their homeless residents for the act of living in the streets when there is nowhere else for them to go, it does not create a right for homeless residents

to occupy indefinitely any public space of their choosing. See Miralle, 2018 WL 6199929, at *2; Sullivan, 2017 WL 4922614, at *4. The Court therefore concludes that Plaintiffs have not shown a likelihood of success on the merits of their Eighth Amendment claim. See Rodriguez v. Robbins, 715 F.3d 1127, 1133 (9th Cir. 2013).

### 2. Fourteenth Amendment Procedural Due Process

Plaintiffs' other argument arises under the Fourteenth Amendment. The Ninth Circuit has held that a person experiencing homelessness does not abandon her property by leaving it on the sidewalk, and thus that property is protected by the Due Process Clause. Lavan, 693 F.3d at 1031. So, "[b]ecause homeless persons' unabandoned possessions are 'property' within the meaning of the Fourteenth Amendment, the City must comport with the requirements of the Fourteenth Amendment's due process clause if it wishes to take and destroy them." Id. at 1032. Lavan held that Los Angeles' policy of seizing and destroying property created a likelihood of success on the merits because the "City's practice of on-the-spot destruction of seized property presents an enormous risk of erroneous deprivation, which could likely be mitigated by certain safeguards such as adequate notice and a meaningful opportunity to be heard." Id. at 1032-33 (internal citation and alteration omitted).

In Miralle, the plaintiffs argued that Oakland had a "'pattern and practice of unlawfully seizing and destroying property during the process of clearing homeless encampments." 2018 WL 6199929, at *3. Judge Gilliam was unpersuaded, because Oakland's "Standard Operating Procedure provides adequate notice and opportunity for Plaintiffs to be heard before property is seized." Id. While Judge Gilliam recognized that the some plaintiffs reported that the City had destroyed their property in violation of that policy, he concluded that "given the City's representation that it will follow its stated procedures, and the notice already provided by the City," as well as the City's representation to the court "that it will follow its stated procedures," plaintiffs were not likely to succeed on the merits of their Due Process claim. Id. However, he noted that the practices that the plaintiffs alleged, "if carried out at [the encampment at issue], would

6

raise serious questions with respect to Plaintiffs' still-pending Fourteenth Amendment claims." Id. He thus ordered that "[s]hould the City choose to renew its efforts to remove Plaintiffs from the [] site, it must provide a new notice to vacate and otherwise comply with all of its Policies and Procedures, including by providing the new notice at least 72 hours in advance, offering shelter beds to each of the 13 [site's] residents evicted, providing notice and storage of collected property, and otherwise adhering to all representations made in its filings and at the [preliminary injunction] hearing." Miralle, 2018 WL 6199929, at *4.

Plaintiffs allege that the City has repeatedly failed to comply with its own policies during previous evictions. The Court concludes that, as Judge Gilliam put it, if the City does behave as Plaintiffs allege, rather than complying with its policies, that behavior "would raise serious questions with respect to Plaintiffs' still-pending Fourteenth Amendment claims." Miralle, 2018 WL 6199929, at *3. The Court thus concludes that Plaintiffs have shown a likelihood of success on the merits of their due process claim if the City cleans and clears the High Street encampment without complying with its existing policies.

### B. Irreparable Harm

Having cleared the "most important" preliminary injunction factor, see Disney Enterprises, Inc., 869 F.3d at 856, Plaintiffs easily satisfy the next factor: irreparable harm. See Rodriguez, 715 F.3d at 1144. Even if the loss of a home and one's property were not an irreparable harm, the Ninth Circuit has held that "an alleged constitutional infringement will often alone constitute irreparable harm." Monterey Mech. Co. v. Wilson, 125 F.3d 702, 715 (9th Cir. 1997) (quoting Associated General Contractors v. Coalition for Economic Equity, 950 F.2d, 1401, 1412 (9th Cir. 1991)). If the City is allowed to clear the encampment in noncompliance with its policies and destroy Plaintiffs' property, Plaintiffs would suffer irreparable harm.

### C. Balance of Equities

The Court is mindful of the City's health and safety interests. However, the balance of the equities tips in favor of Plaintiffs: they risk losing not only their homes, but their

7

community and their possessions if the City cleans and clears the High Street encampment without complying with its policies.

### D. Public Interest

As to the final Winter factor, the Court is once again mindful of the City's health and safety interests, which surely further the public interest. But the residents of the High Street encampment are members of the community, and their interests, too, must be included in assessing the public interest. And this Order does not prevent the City from clearing the encampment in compliance with its policies. The Court thus finds that the public interest weighs in Plaintiffs' favor.

## III. CONCLUSION

For the foregoing reasons, the Court concludes that the Plaintiffs have met their burden to show that a preliminary injunction should issue to enjoin the City from clearing the High Street encampment in a manner that violates its stated policies. The Court thus orders as follows: the City may clean and clear the High Street encampment, provided that it fully complies with its stated policies.

\
\
\
\
\
\
\
\
\
\
\
\

Because the eviction is rapidly impending, this Order has been issued without the

benefit of briefing from Defendants. If Defendants wish to file an opposition to Plaintiffs' request for a TRO, they may do so, and the Court will reconsider its order at that time.

If Plaintiffs wish to seek additional relief, the Court recommends that they consult with the Federal Pro Bono Project's Legal Help Center in either of the Oakland or San Francisco federal courthouses for assistance. The San Francisco Legal Help Center office is located in Room 2796 on the 15th floor at 450 Golden Gate Avenue, San Francisco, California. The Oakland office is located in Room 470-S on the 4th floor at 1301 Clay Street, Oakland, California. Appointments can be made by calling (415) 782-8982 or signing up in the appointment book located outside either office, and telephone appointments are available. Lawyers at the Legal Help Center can provide basic assistance to parties representing themselves but cannot provide legal representation.

**IT IS SO ORDERED.**

Dated: March 3, 2020



CHARLES R. BREYER
United States District Judge